# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

—————————————————— x
:   **Civil Action No. 2:20-cv-04321-ALM-KAJ**

ANTHONY DOVER, on behalf of himself and :
others similarly situated,
:
:
Plaintiff, :
:
v. :
:
CONSUMER SAFETY TECHNOLOGY, LLC:
d/b/a INTOXALOCK,
:
:
Defendant. :
—————————————————— x

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**Introduction**

To conform with changing consumer spending habits increasingly favoring leasing arrangements over traditional credit financing, Congress created the Consumer Leasing Act ("CLA"), 15 U.S.C. § 1667 *et seq.*, in 1976 to extend the protections of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, to consumer leases for personal property. By enacting the CLA, lawmakers made two things clear: (1) that borrowers and lessees both deserve clarity in their transactions; and (2) that such clarity is attained through a detailed system of mandatory disclosures meant to open consumers' eyes as to their financial commitments. TILA (and therefore the CLA) thus has been described as "a disclosure rather than regulatory statute"—giving no quarter for creditors or lessors who burden consumers with confusing disclosures.

Anthony Dover ("Plaintiff") is one such consumer. He alleges in great detail that Consumer Safety Technology, LLC ("Defendant") rented him an ignition interlock device beginning in May 2020 through a lease agreement (the "Agreement") that offered unclear and contradictory payment obligations, ultimately leaving him uncertain as to the true costs of his lease—the precise harm the CLA aims to avoid. Plaintiff's confusion establishes not only his concrete injury for purposes of constitutional standing, but also Defendant's careless disregard of its disclosure obligations under the CLA and its implementing regulations, 12 C.F.R. pt. 1013 *et seq.* ("Regulation M").

Defendant's Motion to Dismiss, ECF No. 9 (the "Motion"), consequently presents no bar to this litigation. Plaintiff adequately alleges Defendant's violations of the law, the injury resulting from those violations, and the potentially widespread harm caused by Defendant's unclear ignition interlock lease agreements. This Court should deny Defendant's Motion in its entirety.

**Legal Standards**

A Rule 12(b)(6) motion "is a test of the plaintiff's cause of action as stated in the complaint,

not a challenge to the plaintiff's factual allegations." *Jack v. S. Park Ventures, LLC*, No. 16-633, 2018 WL 1158370, at *3 (S.D. Ohio Mar. 5, 2018) (Marbley, J.).[1] This Court must construe the complaint in the light most favorable to Plaintiff, the non-moving party. *Id.* Rule 8(a)(2) requires only a short and plain statement of the claim showing entitlement to relief. That is, the "factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

Challenges to jurisdiction under Rule 12(b)(1) "can fall into two categories: facial attacks and factual attacks." *McGee v. E. Ohio Gas Co.*, 111 F. Supp. 2d 979, 982 (S.D. Ohio 2000) (Marbley, J.). "Facial attacks question the sufficiency of the pleading," and "[r]eview of such a motion must take the allegations in the complaint as true and construe them in the light most favorable to the nonmoving party." *Id.* Conversely, "[a] factual attack . . . is a challenge to the factual existence of jurisdiction", in which case this Court "must resolve any factual disputes by weighing the evidence that gives rise to the factual controversy," while maintaining its own "discretion in establishing the factual predicate of whether subject matter jurisdiction exists." *Id.*

## Argument

### I. The CLA imposes strict liability for disclosure violations, as it is a remedial statute construed liberally in favor of consumers.

Before turning to the specifics of Defendant's violations, they must be placed into context. The CLA is but one part of a larger statutory framework intended to protect consumers in all aspects of financial transactions. "Congress enacted the CLA as an amendment to [] TILA and [thereby] extended [] TILA's credit disclosure requirements to consumer leases." *Clement v. Am. Honda Fin. Corp.*, 145 F. Supp. 2d 206, 209 (D. Conn. 2001).

---

[1]     Internal citations, quotations, and footnotes are omitted, and emphasis is added, unless otherwise noted.

Thus, like the rest of TILA, the CLA "is a disclosure rather than regulatory statute," *id*., in that TILA "reflects a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose.'" *Layell v. Home Loan & Inv. Bank, F.S.B.*, 244 B.R. 345, 350 (E.D. Va. 1999). As the Second Circuit explained:

> [The CLA's] primary purpose is to assure a meaningful disclosure of the terms of leases . . . so as to enable the lessee to compare more readily the various lease terms available to him. Because lease financing had become recognized as an alternative to credit financing and installment sales contracts, Congress also intended CLA disclosure requirements to enable comparison of lease terms with credit terms where appropriate. The CLA thus requires lessors of personal property subject to its provisions to make specified disclosures when a lease is entered into.

*Turner v. Gen. Motors Acceptance Corp.*, 180 F.3d 451, 454 (2d Cir. 1999).

"TILA achieves its remedial goals by a system of strict liability in favor of the consumers when mandated disclosures have not been made." *In re Fox*, 391 B.R. 772, 776 (Bankr. N.D. Ohio 2008); *see also Rush v. Am. Home Mortg., Inc.*, No. 07-854, 2009 WL 4728971, at \*5 (D. Md. Dec. 3, 2009) ("In order to ensure that the consumer is protected as Congress envisioned, the provisions of the Act and its implementing regulations must be strictly enforced."). "A creditor who fails to comply with TILA in any respect is liable to the consumer under the statute regardless of the nature of the violation or the creditor's intent." *In re Fox*, 391 B.R. at 776.

"Even technical or minor violations of TILA impose liability on the creditor." *Noel v. Fleet Fin., Inc.*, 971 F. Supp. 1102, 1108 (E.D. Mich. 1997); *see also Semar v. Platte Valley Fed. Sav. & Loan Ass'n*, 791 F.2d 699, 703-04 (9th Cir. 1986) ("[t]echnical or minor violations of TILA or Reg[ulation] Z, as well as major violations, impose liability on the creditor"); *Flesher v. Household Fin. Corp. of Ohio*, 640 F.2d 861, 862-63 (6th Cir. 1981) (finding TILA liability for failure to include a dollar sign in required disclosures); *Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F. Supp. 1399, 1406 (N.D. Ill. 1996) ("[E]ven the most technical disclosure violations—whether or not they cause actual damage or deception—may trigger liability for the offending creditor.").

The Seventh Circuit aptly summarized:

> It is not sufficient to attempt to comply with the spirit of TILA in order to avoid liability. Rather, strict compliance with the required disclosures and terminology is required. Many violations of TILA involve technical violations without egregious conduct of any kind on the part of the creditor. However, Congress did not intend that creditors should escape liability for merely technical violations.

*Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 416 (7th Cir. 1980), *overruled on other grounds, Pridegon v. Gates Credit Union*, 683 F.2d 182 (7th Cir. 1982).

And to that end, "[t]he CLA, like [TILA], is a remedial consumer protection statute and, therefore, should be liberally construed to effectuate its underlying purpose." *Corum v. Fifth Third Bancorp*, No. 99-268, 2003 WL 21672828, at *4 (W.D. Ky. July 10, 2003); *see also Inge v. Rock Fin. Corp.*, 281 F.3d 613, 621 (6th Cir. 2002) ("As a remedial statute, we must construe TILA's terms liberally in favor of consumers."); *accord Eby v. Reb Realty, Inc.*, 495 F.2d 646, 650 (9th Cir. 1974) ("The Truth in Lending Act is a remedial statute designed as much as possible to permit borrowers to make informed judgments about the use of credit. To effectuate this congressional purpose requires that the Act's terms be liberally construed.").

This is, in part, because "[t]he scheme of TILA is to create a system of private attorney generals to aid its enforcement," *Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1040 (6th Cir. 1984), so "any misleading ambiguity—any disclosure that a reasonable person could read to mean something that is not accurate—should be resolved in favor of the consumer." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1202 (9th Cir. 2010).  At its core,

> TILA and the regulations promulgated under it require a creditor to disclose relevant credit information to a consumer in *comprehensible language and form*. The required disclosures are intended to provide, especially to the inexperienced and uninformed consumer, a way to avoid the possibility of deception, misinformation, or at least an obliviousness to the true costs of a credit transaction.

4

*Clement*, 145 F. Supp. 2d at 210. Therefore, "a misleading disclosure is as much a violation of TILA as a failure to disclose at all." *Rush*, 2009 WL 4728971, at *5.[2]

## II. Plaintiff sufficiently alleges that the Agreement provides vague, conflicting, and ultimately overwhelming payment disclosures that violate the CLA.

### A. The CLA and Regulation M require specific disclosures in lease agreements and even provide a model leasing form to promote compliance and protect the public.

The CLA governs all leases longer than four months for personal property used primarily for personal, family, or household purposes, subject to a dollar limit not at issue here. 15 U.S.C. § 1667(1). The statute, in conjunction with Regulation M, demands certain disclosures in these consumer lease transactions, some of which must also be set apart, or "segregated," from the remainder of the lease terms, to allow easy reference by the consumer. Relevant here, lessors like Defendant must clearly and conspicuously disclose:

- the amount of other charges payable by the lessee but not included in the periodic payments, and a description of those charges (15 U.S.C. § 1667a(4));

- the total amount of other charges payable to the lessor beyond the periodic payments, itemized by type and amount, and segregated from the remainder of the lease (12 C.F.R pt. 1013.4(d)); and

- the total of payments, with a description such as "the amount you will have paid by the end of the lease," segregated from the remainder of the lease (12 C.F.R. pt. 1013.4(e)).

Appended to Regulation M and Plaintiff's complaint, *see* ECF No. 1-1, is a model leasing form to be used in consumer transactions like Plaintiff's. This model form presents all requisite disclosures in a format specifically recommended and approved by the Board of Governors of the

---

[2]     When a lessor like Defendant fails to comply with its disclosure obligations, the CLA allows a private cause of action to recover both actual and statutory damages. *See* 15 U.S.C. §§ 1640, 1667d(a); *Lawson v. Bank One, Lexington, N.A.*, 35 F. Supp. 2d 961, 965 (E.D. Ky. 1997) ("A lessor which fails to comply with the provision of the [CLA] is liable to the lessee for damages."). The statute also expressly encourages enforcement via the class action mechanism, as Plaintiff seeks to accomplish here. 15 U.S.C. §§ 1640(a)(2)(B), 1667d(a).

Federal Reserve System ("Board").[3] By rule, even if the model form is *not* used, a consumer lease agreement's "headings, content, and format" nevertheless must be "provided in a manner substantially similar to the" model form. 12 C.F.R. pt. 1013.3(a)(2).

The Board revised the model form in 1996 to adopt Regulation M's then-new "segregated" lease disclosure requirements, explaining:

> [The regulations previously] required that all disclosures be made together on a separate statement or in the lease contract "above the place for the lessee's signature." The Board has deleted this requirement along with the meaningful sequence, same-page, and type-size disclosure requirements, *replacing them with the requirement that disclosures be segregated.* Most commenters generally supported the proposed segregation requirement, although some commenters opposed the deletion of the other requirements. They believed that the signature requirement ensured that lessors would give disclosures before the consumer becomes obligated on the lease and discouraged lessors from putting important information on the back of a lease document. *The Board believes that a segregation requirement and the clear and conspicuous standard provide the same level of protection as the previous rules*.

61 FR 52246-01, 52249 (Oct. 7, 1996).

In so doing, the Board observed consumer and industry feedback regarding this new "segregation" requirement:

> Many commenters believed that consumers would be more likely to read and understand the disclosures if key items were segregated from other disclosures and contract terms. Pursuant to its authority under section 105(a) of the TILA, the Board has adopted the requirement that certain consumer leasing disclosures be segregated from other required disclosures and from general contract terms *to assure clear, conspicuous, and meaningful disclosure of lease terms*.

*Id.* And as to the disclosures' *presentation*, the Board made clear its preference for the model form:

> The Board believes that the segregation requirement and the requirement that disclosures be in a form substantially similar to the applicable model form in appendix A *adequately focuses the consumer's attention on key information.*

---

[3]     The Board initially oversaw the CLA and Regulation M until the creation of the Consumer Financial Protection Bureau ("Bureau") in 2011. For simplicity, references to the "Board" also may include actions or interpretations subsequently adopted or revised by the Bureau.

> Lessors may provide the segregated disclosures on a separate document or may include them in their lease contracts, apart from other information. *The general content, format, and headings for these disclosures should be substantially similar to those contained in the model forms in appendix A.* Lessors may continue to provide the remaining disclosures required by Regulation M and the CLA in a nonsegregated format.

*Id.* For Plaintiff—and likely countless other ignition interlock lessees—Defendant failed to heed the Board's findings and conclusions regarding the model leasing form.

**B. The Agreement confusingly lists at least <u>17</u> different fees and charges, with little explanation of how they will be assessed, in violation of the law.**

**1. Plaintiff adequately pleads Defendant's failings in mixing *potential* fees with mandatory fees.**

Plaintiff adequately alleges that Defendant failed to meet its obligations under the CLA in several respects—each of which provides independent grounds for liability. First, Defendant must clearly and meaningfully disclose "the amount of other charges payable by [Plaintiff] not included in [his] periodic payments, [with] a description of th[ose] charges," 15 U.S.C. § 1667a(4). Additionally, the "total amount of other charges payable to [Defendant], itemized by type and amount, that are not included in the periodic payments" must be properly *segregated* from the remainder of the lease terms. 12 C.F.R. pt. 1013.4(d).

Plaintiff meticulously pleads precisely how the Agreement fails to meet these specific requirements—even going beyond the Rule 8(a) notice pleading standard. *See* ¶¶ 72-88.[4] Beginning with section 1667a(4), the Agreement must clearly and conspicuously disclose the "other charges payable" beyond Plaintiff's periodic (*i.e.*, bi-weekly) payments, plus it must clearly and conspicuously *describe* those charges. In other words, to the extent Plaintiff is obligated to pay any fees or charges beyond his usual bi-weekly lease payments, Defendant is obligated to

---

[4]    Citations to "¶¶ __" refer to paragraphs in Plaintiff's Class Action Complaint, ECF No. 1.

explain as much. *Accord Turner*, 180 F.3d at 454 (the CLA's "primary purpose is to assure a meaningful disclosure of the terms of leases . . . so as to enable the lessee to compare more readily the various lease terms available to him").[5]

The Agreement here does none of these things. It instead lists a dizzying array of some 17 fees beyond the bi-weekly $45.68 "Lease payment," including: (1) a Setup Fee of $29.58; (2) a Device Protection Fee of $5.38; (3) a Data Processing Fee of $3.00 per time, with an "estimated total" of $19.38; (4) an Administrative Closing Fee of $64.49; (5) a State Fee of $12.00; (6) a No Show Fee of $50.00; (7) a Lockout Fee of $80.63; (8) an Early Cancellation Fee of $215.00; (9) an Initial Replacement Fee of $26.88; (10) a Data Log Fee of $25.00; (11) a Reset Calibration Fee of $43.00; (12) an Expedited Shipping Fee "Starting At" $19.35; (13) a Late Payment Charge of $4.99 "subject to any state restrictions"; (14) a Vehicle Switch Fee of $32.25; (15) Labor Per Hour of $53.75; (16) a Chargeback Fee of "[t]he lesser of $30.00, or the maximum amount allowed by state law"; and (17) a Return Check Fee of $15.00. *See* ¶¶ 73-74; ECF No. 1-2 at 1.

If each of these fees were to be assessed just once during the lease term, this represents *several hundred dollars* more that Plaintiff must pay above and beyond his usual bi-weekly payments. Of course, it is not clear whether and to what extent the fees would be assessed, if ever. ¶¶ 73, 81. A search through the Agreement's fine print illuminates additional context for a select

---

[5]     Through its official commentary the Board offers that the CLA's "clear and conspicuous standard requires that disclosures be reasonably understandable." 12 C.F.R. pt. 1013, Supp. I, at 1013.3(a)-2. According to the Third Circuit, "'Understandable' means more than 'legible'; many things are legible but not understandable. It is therefore apparent that the Official Staff Commentary interprets the term 'clearly' to refer to meaning, not just appearance." *Applebaum v. Nissan Motor Acceptance Corp.*, 226 F.3d 214, 220 (3d Cir. 2000). Correspondingly, it strains credulity for Defendant to suggest that "'[c]lear and conspicuous' refers to the mode of presentation, not whether the disclosures are comprehensible to a particular plaintiff," ECF No. 9 at 14, or that mere visibility—as opposed to comprehensibility—is all that matters. *See id.* at 15.

few fees, but Plaintiff is left to guess as to many of them. For example, how often must Plaintiff's data be processed during the lease, and how might those efforts ultimately total $19.38 if each transaction costs a flat $3.00? *See* ¶¶ 77-79. And how is $3.00 "Data Processing" different from a $25.00 "Data Log," why would such a Data Log be necessary, and how often? *See* ¶ 83. Other issues abound. *See id.* (e.g., are "Late Payment Charges" in Ohio "subject to any state restrictions," and does Ohio law affect the $30.00 Chargeback Fee?).

"The [CLA] was intended to provide consumers with comprehensive information about the actual costs of leasing[,] thus enabling them to compare alternatives." *Easterwood v. Gen. Elec. Capital Auto Lease, Inc.*, 825 F. Supp. 306, 310 (N.D. Ga. 1993). Defendant's conflicting and open-ended fee disclosures provide no assurance whatsoever of the "actual costs" of the Agreement; these vagaries are the opposite of assuring, and thus give rise to liability. *See Danger v. Nextep Funding, LLC*, 355 F. Supp. 3d 796, 811 (D. Minn. 2019) ("Section 2 of the [lease] Agreement contains information that a consumer might view as conflicting and confusing"); *Hughes v. Cardinal Fed. Sav. & Loan Ass'n*, 566 F. Supp. 834, 840 (S.D. Ohio 1983) (Spiegel, J.) ("The disclosure forms [] do not in any way explain the essential terms of the variable interest rate. They merely direct the borrowers to examine a legal document to gain information about a very essential term of their loans. This is not sufficient to comply with the TILA.").

### 2. Defendant's half-hearted use of the model form cannot save it from liability.

Turning to Regulation M's *segregation* requirements, while it is true that Defendant attempts to utilize the model form on the first page of the Agreement, *compare* ECF No. 1-1 *with* ECF No. 1-2 at 1, the added itemization of the various fees outlined above creates more confusion than clarity. As Plaintiff states in his complaint, "rather than comply with Regulation M by adequately *segregating* the fees and charges for which Plaintiff is responsible, Defendant clusters together more than a dozen potential fees and charges, and then directs Plaintiff to review the

boilerplate fine print on the next several pages to decipher the purpose and potential imposition of such fees and charges." ¶ 87 (emphasis in original). But any explanations that *might* be found scattered among those remaining pages (pertaining to only *certain* of the additional potential fees) cannot satisfy Defendant's regulatory obligations to properly *segregate* the "total amount of other charges payable" from the bi-weekly lease payments. ¶ 88; 12 C.F.R. pt. 1013.4(d). That is, Defendant's referral to other pages of the Agreement is tantamount to no segregation at all. *Accord Pearson v. Easy Living, Inc.*, 534 F. Supp. 884, 894-95 (S.D. Ohio 1981) (Hogan, J.) (entering judgment for plaintiffs on TILA violations for improper placement of required disclosures).

Defendant hopes to avoid these obvious shortcomings by highlighting the visual similarities between the model form and the Agreement, *see* ECF No. 9 at 8-9, by pointing to actual charges on Plaintiff's account statement, *see id.* at 11, and ultimately by seeking refuge in the Official Comments to Regulation M. *See id.* at 11-12. All of these efforts fall flat, however.

First, while it is true that the Agreement *appears* like the model form, the two still differ in one important respect: Defendant stuffed an additional *15* line items into what it now calls a "lower box" at the bottom of the page, beneath "Other Important Terms." *See* ECF No. 1-2 at 1; ECF No. 9 at 12. By adding this lower box, Defendant essentially *doubled* the size and substance of the model form's intended disclosures—and mixed mandatory fees with potential fees. This is significant, as Regulation M demands that the disclosures required to be "segregated" from all other information (via the model form) "contain only *directly related information*" with "headings, content, and format" "provided in a manner *substantially similar* to the applicable model form." 12 C.F.R. pt. 1013.3(a)(2). So, those 15 additional fees in the lower box should only be included if "directly related" to the requisite disclosures—which apparently is not the case.

Importantly, the model form already includes a designated column for "Other Charges." ECF No. 1-1. And within this column on the Agreement, Defendant includes just three specific non-zero fees: (1) Data Processing; (2) Administrative Closing; and (3) a State Fee. ECF No. 1-2 at 1. Defendant ultimately charged all three fees to Plaintiff, according to the account statement it proffers with the Motion. *See* ECF No. 10 at 4.[6] The 15 *other* fees and charges that Plaintiff complains of, which are printed in the "lower box" at the bottom of the page, ultimately were *not* charged. *See id.* Thus, with the benefit of hindsight, Plaintiff's *actual* charges may be found in those sections of the Agreement that specifically mirror the model form. For Defendant to have then expanded the model form to include additional *potential* fees, which ultimately were *not* assessed to Plaintiff's account, is improper. *See Hemauer v. ITT Fin. Servs.*, 751 F. Supp. 1241, 1243 (W.D. Ky. 1990) ("[T]o justify a departure from TILA the creditor must show that the departure enhances the clarity of the disclosure, facilitates customer comprehension or is required because of the impracticability of any other arrangement.").

---

[6] For purposes of the Rule 12(b)(6) portion of the Motion, this Court should not consider Plaintiff's account statement as it is not central to Plaintiff's claims, nor attached to Plaintiff's complaint, nor referenced therein. *See Jackson v. Thompson*, No. 05-823, 2006 WL 1697631, at *3 (S.D. Ohio June 20, 2006) (Marbley, J.) ("[A]s a general rule, matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss unless the motion is converted to one for summary judgment."); *see also Hogan v. Cleveland Ave Rest. Inc.*, No. 15-2883, 2018 WL 1475398, at *3 n.5 (S.D. Ohio Mar. 26, 2018) (Marbley, J.) (refusing to consider defendants' declarations and corporate documents at the motion to dismiss stage). Defendant contends that the account statement should be considered "because it contains the billing and payment information both referred to in Plaintiff's Complaint (*see* Compl. ¶ 50, ¶¶ 40-48) and central to Plaintiff's claims." ECF No. 9 at 10 n.5. However, the only document dispositive to Plaintiff's claims is the Agreement itself, which Plaintiff alleges fails to provide adequate disclosures under the law. *See generally* ECF No. 1. Whether Plaintiff ultimately paid $1, or $1,000, or nothing at all pursuant to that Agreement is irrelevant; all that matters here is what Defendant did—and did not—disclose in the Agreement. In any event, as explained herein, should the Court elect to consider the account statement, such consideration would only bolster Plaintiff's claims.

Nevertheless, Defendant now asks this Court to determine, as a matter of law, that such expansion is permitted. *See* ECF No. 9 at 11-12. However, "[o]rdinarily, whether disclosures under [TILA] are inaccurate, misleading, or confusing is a question of fact for the factfinder," and thus inappropriate for resolution at the pleading stage. *Clement*, 145 F. Supp. 2d at 209. Plaintiff's claims deserve to be heard by a jury, and he has adequately pleaded them to earn that opportunity. *See Corum*, 2003 WL 21672828, at *4 (refusing to dismiss CLA claim at the pleading stage because "fairness require[d]" related factual determinations).

The jury is entitled to consider that Regulation M's segregation requirements are meant "to assure clear, conspicuous, and meaningful disclosure of lease terms," and to "adequately focus[] the consumer's attention on key information." 61 FR 52246-01, 52249 (Oct. 7, 1996). The very *potential* fees that Plaintiff found confusing, and about which he now complains, distracted from the Agreement's "key" *mandatory* payment terms (as confirmed by the account statement, *see* ECF No. 10), and ultimately clouded the "actual costs" of the Agreement. This ambiguity is something the CLA is meant to protect against. *See Easterwood*, 825 F. Supp. at 310; ¶¶ 84-88.

Along these same lines, it is not true that the additional 15 fees included in the "lower box" are sanctioned by the Official Comments to Regulation M. *See* ECF No. 9 at 12. Defendant's self-serving interpretation is at odds with the Board's edict that "[t]he general content, format, and headings for [segregated] disclosures should be substantially similar to those contained in the model forms []. Lessors may continue to provide the remaining disclosures required by Regulation M and the CLA *in a nonsegregated format*." 61 FR 52246-01, 52249 (Oct. 7, 1996).

Plaintiff alleges that Defendant's decision to ignore this guidance and place an additional *15* fees (none ultimately charged) within the segregated disclosures, rather than among the *non*segregated disclosures, risked consumer confusion and distraction from the key lease terms.

12

Whether Defendant's placement constitutes a violation is, at a minimum, a question for the jury—and not grounds for dismissal of this action.[7] *See Danger*, 355 F. Supp. 3d at 810-11 (refusing dismissal of CLA claims over payment disclosures because "[g]iven the language of the Agreement, the Court cannot say, as a matter of law, that the disclosures in question meet the clear and conspicuous standard advanced by" the defendant).[8]

### C. The Agreement provides conflicting amounts for the "total of payments" Plaintiff owes, in further violation of the CLA and Regulation M.

Next, the Agreement fails in another respect: Plaintiff was in the dark as to his total financial commitment. Regulation M demands segregated disclosure of the "total of payments" owed under the lease, "with a description such as 'the amount you will have paid by the end of the lease.'" 12 C.F.R. pt. 1013.4(e). This disclosure is meant to apprise the consumer of his total financial obligation over the term of the lease, so the "total of payments" is to be calculated by

---

[7]     Defendant insists that it is permitted to use estimations for its Data Processing Fees, and that the *timing* of its fees are not subject to mandatory disclosure. *See* ECF No. 9 at 11-12. Both arguments miss the point. Plaintiff pleads confusion as to *whether*, if at all, he would be charged many of the fees listed in his Agreement, *see* ¶¶ 71-88, 103, not simply *when* it would happen. And his confusion extends to the estimated Data Processing Fees; Defendant estimated an irregular sum that did not—and cannot—square with the stated fee. *See* ¶¶ 77-78 (Defendant's estimation of $19.38 is not evenly divisible by $3.00). This is the confusion the CLA is meant to avoid. *See Clement*, 145 F. Supp. 2d at 210 ("TILA and the regulations promulgated under it require a creditor to disclose relevant credit information to a consumer in *comprehensible language and form*.").

[8]     The Northern District of Ohio's decision in *Gaydos v. Huntington Nat'l Bank*, 941 F. Supp. 669 (N.D. Ohio 1996), is a red herring. *See* ECF No. 9 at 11. In that action concerning the lessor's accounting for profits earned from its investment of the lessee's security deposit, the court considered the very narrow issue of whether such investment profits inure to lessees' benefit and thus should qualify as "charges" against their remaining lease payments. 941 F. Supp. at 675. The issue at hand was how far the CLA reasonably could be stretched to require disclosure of information not expressly addressed in the statute or Regulation M. Conversely, Plaintiff's claims here center on Defendant's duty to properly disclose payment obligations—something fundamental to a lessor-lessee relationship and expressly required by the CLA and Regulation M.

taking "the sum of the amount due at lease signing . . . the total amount of periodic payments . . . and other charges" payable along the way. *Id.*

Though the Agreement purports to disclose $840.27 as the "Total of Payments (The amount you will have paid by the end of the Lease, including sales tax and state mandated fees, if applicable)," this figure is irreconcilable with other of the Agreement's terms—and thus inaccurate and violative of Regulation M. ¶ 91. Indeed, there are multiple inconsistencies.

*First*, the "Other Charges" in the third column include an *estimated* line item of $19.38 for Data Processing Fees. *See* ECF No. 1-2 at 1. Putting aside that this estimation cannot square with the $3.00 per-transaction fee, as explained above, the total "Other Charges" of $95.87 necessarily relies upon an estimation for Data Processing Fees, which means the $95.87 itself is an estimation. And because $95.87 necessarily is an estimation, so, too, is the $840.27 provided for "Total of Payments." But Defendant does not make this clear and thus likely overestimated or underestimated Plaintiff's total obligations without stating so.

*Second*, the 15 additional "lower box" fees present the same problem. The $840.27 "Total of Payments" does not account for *any* of these potential fees, thereby potentially underestimating the true cost of the lease by hundreds of dollars. ¶¶ 94-96. Nor does Defendant provide a disclaimer that its "Total of Payments" tally of $840.27 is subject to change depending upon the imposition of any of the 15 "lower box" fees. Defendant instead opts for the antiquated, and now unlawful, approach of "Let the buyer beware" rather than "Let the seller disclose." *Layell*, 244 B.R. at 350.

It bears repeating that the function of segregated disclosures is to present only the most important information in a dedicated space that focuses consumers' attention on the "key" lease terms. 61 FR 52246-01, 52249 (Oct. 7, 1996). Either the 15 "lower box" fees rise to such a level as to be properly included, and explained, in Plaintiff's total obligation, or they do not—in which

case they do not belong among the segregated disclosures.[9] Plaintiff sufficiently pleads that, under either scenario, Defendant has failed him and other similarly situated lessees. ¶¶ 91-96; *see also Taylor v. TimePayment Corp.*, No. 18-378, 2019 WL 1375594, at *14 (E.D. Va. Feb. 5, 2019), *report and recommendation adopted in part*, 2019 WL 1449622 (E.D. Va. Mar. 31, 2019) (sustaining TILA claims for inadequate disclosure of "total of payments"); *Danger*, 355 F. Supp. 3d at 810-11 (same for CLA claim over allegedly under-reported "total of payments").

*Third*, the Agreement presents confounding discrepancies between Plaintiff's total obligation and the official fees and taxes he must pay. ¶¶ 97-100. While on the one hand disclosing a "Total of Payments" of $840.27, on the very next page Defendant advises that "[t]he total amount [Plaintiff] will pay for official fees and taxes over the term of [his] Lease, whether included with [his] recurring payments or assessed otherwise, is: $840.27." ¶ 97. More confusing, Defendant cautions that this "is an estimate based on an estimate of $25.68 for sales tax and an estimate of $12.00 for other state mandated fees . . . ." *Id.* There is no way of reconciling that Plaintiff's total obligation is $840.27 even though his "official fees and taxes," *alone*, also are $840.27, based on estimated sales tax of $25.68 and $12.00 in other "state mandated fees." None of this makes sense.

Even accepting that the Agreement includes a typo (or two) in this particular section—which by itself is sufficient for CLA liability, *see Noel*, 971 F. Supp. at 1108 ("Even technical or minor violations of TILA impose liability on the creditor.")—the estimated official taxes of $25.68

---

[9]    Ironically, Defendant agrees with Plaintiff that "informational overload" should be avoided in lease disclosures, citing the Supreme Court's finding in *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568-69 (1980) (emphasis in original), that "*[m]eaningful* disclosure does not mean *more* disclosure." *See* ECF No. 9 at 15. But Defendant's attempted use of the model form is no blanket bar to liability, as Defendant suggests. *Id.* This is particularly true where Defendant used an *expanded* model form stuffed with an additional 15 "lower box" fees lacking any accompanying explanation of whether and how they would be applied. Indeed, Defendant most certainly "overloaded" the requisite segregated disclosures in Plaintiff's Agreement.

are not listed elsewhere among the segregated disclosures, and thus are not ostensibly included in Plaintiff's "Total of Payments." The Motion is conspicuously silent on this confusion, stating only that "Plaintiff's total taxes were disclosed[,] and Plaintiff was charged consistent with the amount disclosed." ECF No. 9 at 14. Of course, this does not address Plaintiff's well-pleaded allegations that the disclosed taxes conflict with the rest of the payment disclosures. *See* ¶¶ 98-99.[10]

Given the foregoing, Plaintiff has sufficiently stated a claim for violations of the CLA.

## III. Plaintiff has suffered a sufficient injury for Article III standing.

Lastly, Plaintiff specifically pleads that, as a result of Defendant's failure to adequately disclose his payment obligations, "he was confused and unsure as to many of [the Agreement's] financial terms, including" his *total* obligation under the lease, his obligation for official fees and taxes, and whether and to what extent he would be assessed the other fees and charges crammed into the lower box of the Agreement. ¶ 103. Plaintiff thus suffered the very type of harm the CLA aims to prevent—confusion and obliviousness over lease terms tantamount to deception by Defendant. ¶ 104; *Clement*, 145 F. Supp. 2d at 210.

Plaintiff sufficiently pleads his injury resulting from Defendant's CLA violations, so Defendant's efforts to demonstrate otherwise ring hollow. *See* ECF No. 9 at 5-7. Defendant misunderstands the activities giving rise to Plaintiff's standing. That it ultimately charged Plaintiff only six unique fees that all appear in the Agreement is beside the point. *See id.* at 6. The crux of this lawsuit is Defendant's failure to comply with the CLA's disclosure requirements by including

---

[10] *Schmidt v. Nissan Motor Acceptance Corp.*, 104 F. Supp. 2d 955 (N.D. Ill. 2000), provides more support for Plaintiff than it does Defendant. *See* ECF No. 9 at 15. There, the plaintiffs complained of a $250 disposition fee not being adequately disclosed. 104 F. Supp. 2d at 957. The court ultimately *denied* a motion to dismiss, finding the complaint "satisfies the liberal notice pleading standard of Rule 8, which requires plaintiffs only to give defendant minimal notice of the basis of the suit," and that "a reasonable jury could conclude that defendant's disclosure of the disposition fee violated the Consumer Leasing Act." *Id.* So, too, here.

the bevy of *other* fees and charges listed on that same page, none of which may have been charged ultimately, but all of which implied hundreds of dollars in added cost—without proper explanation. Defendant's violations—and the requisite harm to Plaintiff—stem *not* from the monies assessed to Plaintiff's account *during the term of the lease* but rather from the inadequate and confusing explanations of those assessments *at the outset of the lease*.

Defendant baldly states that "[f]ees not charged cannot be the basis for injury-in-fact and standing." ECF No. 9 at 7.[11] This misses the mark entirely, and in fact, district courts have applied *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), to find Article III standing for CLA violations materially identical to Plaintiff's. For example, the Eastern District of Virginia observed that

> Congress enacted the CLA to prevent the deception, misinformation, and obliviousness to the true costs of credit or lease terms encountered by inexperienced or uninformed consumers. To further this goal, the CLA requires lenders to make numerous written, and sometimes segregated, disclosures to borrowers.
>
> As alleged in the Complaint . . . Taylor plausibly alleges that Timepayment violated a number of these requirements. These purported violations include, among others: (1) providing misinformation, by misleadingly identifying the sum of the monthly payments as the total amount due under the Agreement; and, (2) omitting required information, such as the total amount due under the Agreement. *These alleged violations do not merely represent a failure to disclose required information; as alleged, they arguably provide inaccurate information, via questionable provisions, which potentially mislead the consumer.*
>
> Taylor at times describes the disclosures as "misleading[ ]," and describes himself as "unaware" of the true financing cost associated with purchasing the heat pump. The statutory violations, it seems, go to the heart of what the CLA sought to

---

[11]    *Miller v. Nissan Motor Acceptance Corp.*, 362 F.3d 209 (3d Cir. 2004), provides no threat to Plaintiff's standing here. *But see* ECF No. 9 at 7. *Miller* involved several claims under the CLA, including § 1667a disclosure violations and a § 1667b(b) claim over the reasonableness of an early termination fee. The court dismissed only this latter claim because the plaintiffs "never paid the early termination charge pursuant to the Paragraph 18 formula. Therefore, they were not harmed by it, even assuming it is unreasonable and violates § 1667b(b)." 362 F.3d at 221. Here, however, Plaintiff does not challenge the fees themselves; he takes issue with the sufficiency of their *disclosure* by Defendant. And to that end, worth noting, while the Third Circuit dismissed the § 1667b(b) claim, it also *confirmed liability* under § 1667a—the provision at issue here—for Nissan Motors' multiple disclosure failures in the plaintiffs' lease agreements. *Id.* at 219-220.

prevent: deception of, misinformation directed at, and obliviousness of a consumer as to the terms and amount due under a lease agreement. *Taylor plausibly alleges that Timepayment violated the CLA's required disclosures; and he plausibly alleges that he suffered the kind of harm Congress intended to prevent by regulating these very disclosures.*

*Taylor*, 2019 WL 1449622, at *7-8.

And in *Danger*, the District of Minnesota confirmed standing in an analogous situation involving disputed disclosures in a lease agreement:

> Danger has alleged that Defendants failed to adequately convey the total amount she owed under the Agreement, the total finance charge she was required to pay, and the finance charge expressed as an APR. These allegedly inadequate disclosures created a risk of real harm to a concrete interest that both the TILA and the CLA were enacted to protect—the informed use of credit. And, in this case, Danger has plausibly alleged that "real harm" materialized, as she continues to pay an interest rate of more than 120% for her dog. Further, Plaintiff alleges that she chose not to shop for credit or obtain alternative financing at a better rate because of Defendants' allegedly inadequate disclosures. For all of these reasons, the Court finds that Plaintiff has properly alleged standing to seek monetary relief for her claims under the TILA and CLA.

355 F. Supp. 3d at 808; *accord* ¶ 108 ("Had Plaintiff known of the true costs involved, he would have pursued other options to obtain the ignition interlock device he needed.").

Also apposite, the Sixth Circuit confirmed that disclosure violations of federal consumer protection statutes confer standing. In *Macy v. GC Servs. Ltd. P'ship*, 897 F.3d 747 (6th Cir. 2018), the Sixth Circuit found sufficient harm for Article III standing where a debt collector sent initial debt collection letters lacking certain disclosures mandated by the Fair Debt Collection Practices Act ("FDCPA"). The violations concerned incomplete disclosures regarding consumers' need to submit written disputes to trigger certain protections under the FDCPA. The Sixth Circuit found standing because the "letters present[ed] a risk of harm to the FDCPA's goal of ensuring that consumers are free from deceptive debt-collection practices because the letters provide[d] misleading information about the manner in which the consumer can exercise [his] statutory right to obtain verification of the debt or information regarding the original creditor." *Id.* at 757.

The Sixth Circuit satisfied itself that the mere "risk of harm" traceable to the defendant's failures conferred standing, for without the statutorily-mandated disclosures, "Plaintiffs were placed at a materially greater risk of falling victim to 'abusive debt collection practices'" that the FDCPA was enacted to prevent. *Id.* at 758 (citing 15 U.S.C. § 1692(e)); *see also Geary v. Green Tree Servicing, LLC*, No. 14-522, 2017 WL 2608691, at *3-5 (S.D. Ohio June 16, 2017) (Marbley, J.) (confirming FDCPA standing because the claimed injury "involve[d] the failure to disclose required information, the disclosure of which was the purpose of the statute").

So, too, here for Plaintiff—the failure of Defendant to carefully follow the disclosure requirements of the CLA left him confused and oblivious as to the total cost to him under the Agreement. *Accord Strubel v. Comenity Bank*, 842 F.3d 181, 190 (2d Cir. 2016) ("A consumer who is not given notice of *his* obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him. For that reason, a creditor's alleged violation of each notice requirement, by itself, gives rise to a 'risk of real harm' to the consumer's concrete interest in the informed use of credit.") (emphasis in original).

And despite Defendant's protests to the contrary, this confusion is enough to satisfy standing even if it did not actually lead to Plaintiff paying more than the "Total of Payments" disclosed in the Agreement. *See Macy*, 897 F.3d at 759 ("GC next argues that its failure to include the in-writing requirement never materialized into actual harm. However, as explained, Plaintiffs may satisfy the concreteness prong of the injury-in-fact requirement of Article III standing by alleging that GC's purported FDCPA violations created a material risk of harm to a congressionally recognized interest . . . . Accordingly, having alleged such procedural violations, Plaintiffs were not required to allege any additional harm to demonstrate the concrete injury necessary for standing, and GC's claim that Plaintiffs have not alleged a concrete injury because

19

they did not identify actual harm stemming from GC's defective notices fails.").

The Motion says nothing of the harm presented by its multifaceted CLA violations concerning Plaintiff's payment obligations under the Agreement, or of Plaintiff's detailed allegations concerning such harm.[12] *See* ECF No. 9 at 5-7. Defendant's standing challenge thus should be rejected out of hand. *See Taylor*, 2019 WL 1449622, at *7-8; *Danger*, 355 F. Supp. 3d at 808; *Cox v. Porsche Fin. Servs., Inc.*, 342 F. Supp. 3d 1271, 1283-84 (S.D. Fla. 2018) (finding standing to assert CLA claims predicated upon insufficient disclosures).[13]

### Conclusion

Defendant's meritless arguments are properly suited for trial rather than the pleading stage. The allegations here make clear the numerous ways in which the Agreement makes conflicting and confusing payment disclosures, how such disclosures violate specific statutory and regulatory requirements, and how they resulted in Plaintiff's confusion over his payment obligations— precisely the harm the CLA intends to avoid. There is more than enough specificity to put Defendant on notice of the violations alleged. The Motion should be denied so that Plaintiff may pursue relief both for himself and for all others in Ohio given similarly deficient leases.

---

[12]    Plaintiff's stated confusion and obliviousness, *see* ¶¶ 103-104, set this matter apart from *Eike v. Allergan, Inc.*, 850 F.3d 315, 318 (7th Cir. 2017) ("One cannot bring a suit in federal court without pleading that one has been injured in some way (physically, financially—whatever) by the defendant."). *But see* ECF No. 9 at 5, 7. Moreover, the *Eike* decision has since been criticized for "flip[ping] the standing inquiry inside out, morphing it into a test of the legal validity of the plaintiffs' claims of unlawful conduct." *Cottrell v. Alcon Labs.*, 874 F.3d 154, 166 (3d Cir. 2017); *see also Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1, 9 (1st Cir. 2018).

[13]    Defendant contends that if the Court finds Plaintiff lacks standing, it should dismiss this matter with prejudice. ECF No. 9 at 9. That is wrong. *See, e.g.*, *Revere v. Wilmington Fin.*, 406 F. App'x 936, 937 (6th Cir. 2011) ("Dismissal for lack of subject-matter jurisdiction should normally be without prejudice, since by definition the court lacks power to reach the merits of the case."); *Pratt v. Ventas, Inc.*, 365 F.3d 514, 522 (6th Cir. 2004) ("[A] dismissal for lack of subject matter jurisdiction does not operate as an adjudication on the merits for preclusive purposes."). In any event, as set forth above, Plaintiff has standing to assert his claims.

Dated: October 29, 2020               Respectfully submitted,

*/s/ H. Lee Thompson*
H. Lee Thompson
Ohio Bar #0033251
The Thompson Law Firm Co. LPA
3360 East Livingston Ave., Suite 2 B
Columbus, OH 43227
Tel: (614) 461-9000
thomlaw@msn.com

*Trial Attorney for Plaintiff and the proposed class*

Jesse S. Johnson (*pro hac vice*)
Greenwald Davidson Radbil PLLC
7601 N. Federal Hwy., Suite A-230
Boca Raton, FL 33487
Tel: (561) 826-5477
jjohnson@gdrlawfirm.com

*Counsel for Plaintiff and the proposed class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 29, 2020, I filed a copy of the foregoing through the Court's CM/ECF system, which will provide notice to all parties of record.

*/s/ H. Lee Thompson*
H. Lee Thompson

21